HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| WILDWOOD TOWNHOMES OWNERS ASSOCIATION, a Washington Non-Profit Corporation,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., a Wisconsin Corporation; and DOE INSURANCE COMPANIES 1–10,<br><br>Defendants. | NO. 2:21-cv-01080-BJR<br><br>DECLARATION OF JIM LEATZOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WITNESS JIM LEATZOW |

Jim Leatzow, on oath, deposes and states:

1.     I am over the age of 18, competent to testify, and do so of my own personal knowledge. I have personal knowledge of all the facts set forth in this Declaration of Jim Leatzow in Support of Plaintiff's Opposition to Defendant's Motion to Exclude Testimony of Witness Jim Leatzow ("Declaration") and if called upon to testify, I could and would testify competently thereto.

2.     I am the President of Leatzow & Associates, Inc., a consulting firm offering property and casualty insurance consulting services, expert services, and arbitration services.

3.     I have over 48 years of experience in the insurance industry. Beginning in 1975, I sold property insurance products, as well as casualty, life, health, and disability insurance products, to both personal and commercial lines accounts.

DECLARATION OF JIM LEATZOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WITNESS JIM LEATZOW - 1

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

4.     I was a licensed insurance agent, broker, and producer nationally for 23 years. I have been continuously licensed as an Illinois producer for the last 48 years, since 1975. I have been licensed as a Wisconsin producer for the last 34 years, between 1989 and 2023. I was licensed in Washington state for 21 years between 1982 and 2006.

5.     I established a national construction industry specific liability program, whereby I personally authored a manuscript liability insurance policy form, unique endorsements, applications, underwriting guidelines, claims handling manual, and the premium rate filings for a segment of the construction industry. This liability insurance program was fully approved on an "admitted basis" in the Departments of Insurance in 50 states, as well as the District of Columbia. I was responsible for the functions of marketing, sales, underwriting, policy pricing, and physical issuance of new and renewal policies associated with this liability insurance program nationally for 23 years. I also became a Third-Party Claims Administrator ("TPA") for this program. As such, I was responsible for adjusting and adjudicating all construction defect claims for the program between 1985 and 2005. I have 20 years of experience on how claims should be adjusted and the standard of care in the insurance industry for claims adjustment.

6.     As an underwriting, coverage, claims handling, and bad faith expert, I have been qualified to testify in various state courts, as well as all federal court districts. I have rendered expert opinions nationally concerning a myriad of insurance industry customs and practices, plus insurance coverage pertaining to property and liability insurance. Between 2005 and the present, a significant portion of my work as an expert has involved opining on agent, broker, and/or producer standard of care issues in addition to claims handling standard of care, coverage and bad faith claims handling nationally. A true and correct copy of my Curriculum Vitae further detailing my experience is attached to this Declaration as Exhibit A.

7.     Since 2005, I have been retained as an expert over 700 times regarding insurance related issues. I have been retained as an expert in claims handling standards numerous times and

DECLARATION OF JIM LEATZOW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY OF WITNESS JIM
LEATZOW - 2

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

to my knowledge have never been excluded as an expert when offering testimony in relation to claims handling standards.

8.      I was retained in this matter to evaluate the procedure and manner in which Defendant American Family Mutual Insurance Company, S.I. ("American Family") adjusted the Wildwood Townhomes Owners Association's ("Association") first party property insurance claim. As part of my assignment, I reviewed the pleadings, correspondence between the parties, existing case law, reports prepared by both Evolution Architecture and YA Engineering Services, American Family's claim file, which includes claims correspondence, American Family's coverage determination, and the Association's letter under the Insurance Fair Conduct Act ("IFCA") to American Family.

9.      I also reviewed and am familiar with the provisions of the Washington Administrative Code ("WAC") related to insurance claims handling. I reviewed and am familiar with the WACs as they set forth minimum standards in Washington for an insurer's investigation of property claims in Washington and inform industry standards for how an insurance company should investigate claims.

10.      Based on my 48 years of experience, I understand that an insurer owes a duty of good faith to its insured as part of its investigation of a property claim, and that as part of this duty of good faith, an insurance company should deal fairly with its insured and give equal consideration to the insured's interests in coming to a claim determination. As part of the premium paid by a policyholder, the policyholder is entitled to and deserves a prompt, reasonable, thorough, and comprehensive investigation, and a fair and impartial evaluation of a claim submitted to its insurer. In addition, it is the custom and practice for the claims adjuster to provide a full disclosure of all pertinent benefits and coverages available under the applicable insurance policy. The insurance company must not favor its financial interest above the insured's and instead must attempt to find coverage if coverage exists.

DECLARATION OF JIM LEATZOW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY OF WITNESS JIM
LEATZOW - 3

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

11.     Based on my extensive review of the facts and documents in this case, as discussed in paragraph eight above and as set forth on page seven of my expert report (Dkt. #47-1 Ex. A to Declaration of Stephania Denton), my knowledge of industry standards based on my 48 years of experience, and professional certainty regarding the insurance industry, I determined that American Family fell below industry standards regarding the adjustment of insurance claims as follows:

(a)   The Association tendered a claim to American Family for hidden damage at the Wildwood Condominiums on June 26, 2019. A joint intrusive investigation was completed at the Wildwood Condominiums on April 27–29, 2020. The Association produced Evolution Architecture's Building Envelope Investigation Findings Report to American Family on May 14, 2020. A cost of repair estimate was prepared by Charter Construction, which was produced to American Family on July 3, 2020. The Association's historic business records were made available to American Family in February 2020 and July 2020. In September 2020, American Family still had not reached a coverage determination regarding the Association's claim. Therefore, on September 11, 2020, counsel for the Association, Justin Sudweeks, drafted a letter to American Family and requested that American Family come to a coverage determination. American Family did not issue its coverage determination, in which it denied the Association's claim, until November 16, 2020. American Family's investigation and adjustment of the Association's claim took over fourteen (14) months to complete. Based on my professional experience, American Family's conduct fell below industry standards regarding the adjustment of insurance claims. This is especially true because the Association had to specifically request that American Family come to a coverage determination. Even after receipt of the Association's request that

DECLARATION OF JIM LEATZOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WITNESS JIM LEATZOW - 4

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

American Family issue a coverage determination, American Family waited months before it denied coverage for the Association's claim.

(b) American Family failed to adequately communicate with its policyholder, the Association. The Association drafted a letter to American Family pursuant to the Insurance Fair Conduct Act. American Family never provided a substantive response to this letter or gave any indication to its insured that it considered the Association's letter, which explained in great detail why the Association believed American Family's coverage determination was incorrect.

(c) American Family's coverage determination listed a number of exclusions which American Family failed to explain and failed to provide a reasonable explanation regarding how its policy language supported a denial of the Association's claim. American Family failed to comply with industry standards by denying the Association's claim without adequate explanation.

(d) American Family failed to consider opinions from the Association's expert, Evolution Architecture, including that wind-driven rain/weather was a cause of damage at the Wildwood Condominiums. American Family failed to attempt to find coverage for the Association or provide full disclosure as it does not mention or explain anything in its denial letter regarding whether the policy provides coverage for rain/weather.

12. Based on these deviations from industry standards, I determined that American Family failed to attempt to "find coverage" for its insured, the Association, as was its obligation and duty to do so, and that American Family was not fair and impartial and instead appears to have placed its interests ahead of the Association's, which is not in accordance with industry standards for claims handling.

DECLARATION OF JIM LEATZOW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY OF WITNESS JIM
LEATZOW - 5

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

13.     I have reviewed American Family's motion to exclude my testimony and all supporting declarations and exhibits to American Family's motion. In its motion, American Family does not explain that I came to my conclusion that American Family's investigation did not meet industry standards based on my review of a multitude of documents in relation to this claim, as well as based on my 48 years of experience, but instead falsely claims at pages six through ten of its motion that:

> "Leatzow's report lacks discussion of relevant facts and data, lacks reliable principals and methods, and lacks an application of principals and methods to the facts of the instant case. Moreover, Leatzow's deposition testimony confirms that his report is the product of his own views and suppositions, and not a thorough review of the facts that are specific to this case."

American Family's claim that I have no reliable principles or methods on which my opinions are based is simply incorrect. In my expert report I make it clear that my opinions are based on industry standards including: "A reasonable degree of professional certainty within the *insurance industry*" based on "[m]y 47 years in the property/casualty insurance business," (page seven of my expert report) including a review of WACs which set forth minimum claims handling standards in Washington.

14.     American Family's claim that my expert report lacks discussion of relevant facts and data is also just a complete misrepresentation. My expert report was structured so that page seven of my expert report identifies the multitude of documents I reviewed in coming to my opinions. Based on the numerous documents I reviewed in relation to this matter, and my experience as to how claims handling should be conducted in the industry, pages four through six of my report then explain the specific ways in which American Family's claims handling does not meet industry standards. Based on all of the above, I then came to my opinions (page 6 of my expert report) in which I conclude that American Family deviated from industry standards by not attempting to find "coverage" for its insured, the Association, as was its obligation to do so, that American Family's investigation was not fair or impartial as American Family instead attempted

DECLARATION OF JIM LEATZOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WITNESS JIM LEATZOW - 6

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

1  to put its interest ahead of the insured's, and that American Family failed to meet minimum

2  claims handling standards.

3       15.     On pages five and six of its motion, American Family tries to claim that because I

4  reviewed WACs, which set forth minimum claims handling standards in Washington and inform

5  industry standards in the insurance industry, that my opinions are purely legal conclusions. This

6  is also not true. It is the standard in my industry to be familiar with WACS as evidenced by the

7  fact that American Family's own expert also and similarly analyzed WACS in her report.

8       16.     My deposition in this matter was taken on February 10, 2023. At my deposition I

9  clearly explained to American Family that my opinions were based on custom and practice within

10 the industry. Attached as Exhibit B (58:10–14) is a true and correct copy of my deposition

11 testimony to this effect.

12      17.     In its motion (p. 10:18–26), American Family claims that I provided no analysis  in

13 my expert report regarding my opinions that "(2) AmFam failed to attempt to 'find coverage' for

14 their insured, Wildwood, as was their obligation and duty to do[,]" and that "(3) AmFam failed to

15 act in good faith throughout their adjusting of the Wildwood claim and placed their financial

16 benefit ahead of their policyholder, Wildwood . . . ." While this is just not true as my expert report

17 fully explained these opinions, American Family omits that I further explained the basis for these

18 opinions at my deposition. Attached as Exhibit C (57:15–58:12, 14–59:7, 13–23, 60:1–9) is a true

19 and correct copy of my deposition testimony further explaining why American Family acted and

20 performed below industry standards in failing to attempt to "find coverage" for the Association's

21 claim, as was its obligation. Attached as Exhibit D (60:10–61:14) is a true and correct copy of my

22 deposition testimony explaining why I believe that American Family put its financial interests

23 ahead of the Association's in its coverage investigation.

24      18.     In its motion (p. 9:2–4), American Family also claims with respect to my opinion

25 that American Family did not conduct a prompt investigation that: "In fact, Leatzow conducted

26 **no analysis** of American Family's efforts to resolve the Association's claim whatsoever, nor did

27

DECLARATION OF JIM LEATZOW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY OF WITNESS JIM
LEATZOW - 7

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

he even attempt to do so." This does not follow from the opinions expressed in my expert report or from my deposition testimony, where I repeatedly explained that I determined, based on all the information I reviewed in this case, which included American Family's claim file (that documented American Family's activities in adjusting the Association's claim), that American Family did not promptly investigate the Association's claim. Attached as Exhibit E (31:10–32:23, 39:6–40:2, 51:2–52:7) is a true and correct copy of my deposition testimony to this effect.

19.     In its motion (p. 6:9–10), American Family claims that: "Because Leatzow's report and opinions either seek to instruct the jury as to the applicable law or offer an opinion as to an ultimate issue of law, they are inappropriate and must be stricken." This is not an accurate description of my testimony and opinions in this matter. For example, at page one of my expert report, I make it clear that "I have been retained as an insurance expert on behalf of Plaintiff Wildwood Townhomes Owners Association to **evaluate the manner in which Defendant, American Family Mutual Insurance Company, adjusted Wildwood's first party, property claim** tendered on June 26, 2019." Consistent with my report, I testified at deposition that "**my marching orders in this case was to only offer my opinions concerning the process and procedure and the manner in which the claim was adjusted**." Attached as Exhibit F (16:8–23, 40:9–16) is a true and correct copy of my deposition testimony to this effect.

20.     I do not intend at trial to provide any ultimate issue testimony that American Family acted in bad faith or violated a Washington statute. Rather, I intend to testify that as discussed in paragraphs seven through eleven of this Declaration that American Family's process, procedures, and the manner in which American Family adjusted the Association's claim simply did not meet industry standards based on my 48 years of experience.

21.     In its motion, American Family states that my testimony was stricken in the case *American Service Ins. Co. v. Iousoupov.* To my recollection, I was never formally retained in this matter. Additionally, I have been informed that an unsigned affidavit in this matter has been used to claim my involvement.

DECLARATION OF JIM LEATZOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WITNESS JIM LEATZOW - 8

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

1        I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE

2   UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

3       Dated this 14th day of April, 2023, at Three Lakes, Wisconsin.

4

5                 Jim Leatzow

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF JIM LEATZOW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY OF WITNESS JIM
LEATZOW - 9

STEIN, SUDWEEKS & STEIN, PLLC
16400 SOUTHCENTER PARKWAY., SUITE 410
TUKWILA, WA 98188
PHONE 206.388.0660 FAX 206.286.2660

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, a copy of the foregoing **Document** and this *Certificate of Service* were served on counsel below as noted:

<u>Attorneys for Defendant American Family</u>
<u>Mutual Insurance Company, S.I.:</u>
Brian T. Kiolbasa
Avin Singh
Stephania C. Denton
LANE POWELL PC
1420 Fifth Ave, Ste 4200
PO Box 91302
Seattle, WA 98111
Email: kiolbasab@lanepowell.com;
singha@lanepowell.com;
dentons@lanepowell.com

☐ via US Mail
☐ via Legal Messenger
☐ via Email
☑ via USDC ECF

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

SIGNED this 17th day of April, 2023, at Tukwila, Washington.

*s/Zach Heafner*
Zach Heafner, Paralegal
16400 Southcenter Parkway, Suite 410
Tukwila, WA 98188
Email: zach@condodefects.com
Phone: (206) 388-0660

CERTIFICATE OF SERVICE - 1

# EXHIBIT A

# Jim Leatzow

## *Expert Services / Litigation Support / Insurance Industry Specific*



48 years of property/casualty insurance industry & agency experience

23 years national Managing / Underwriting General Agent experience

20 years national 3rd Party Administrator (TPA) claims adjusting experience

48 years licensed property-casualty Agent / Broker / Producer

26 years reinsurance experience

19 years ARIAS Certified Insurance & Reinsurance Arbitrator

Licensed producer & surplus lines broker in 50 states + D.C. until October 2005

**President/Founder, Leatzow & Associates, Inc. (consulting firm)-1975 to present**
**President/Founder, Three Lakes Insurance Co., (reinsurer) - 1992 to 2019**

**Practical insurance & reinsurance industry experience including:**

- Property-Casualty **Agent / Broker / Producer** duties & standard of care
- Managing General / Underwriting Agent (**MGA/MGU**) / **Wholesaler** duties & standard of care
- **Third Party Administrator (TPA)**: claim adjusting duties & standard of care
- **Bad faith expert:** qualified nationally in state & federal courts
- **Commercial Liability policy Underwriter** and **National Claims Adjuster** (20+ years)
- **Coverage & claims expert:** offering opinion on coverages, placement & disputes involving:
  *General Liability ♦ Property ♦ Aviation ♦ Workers Comp ♦ Auto ♦ Casualty Insurance*
  *Professional Liability ♦ Errors & Omissions (E&O) ♦ Excess - Surplus lines*
- **Construction industry insurance** underwriting, placement & claim adjusting **(23 years)**
- **Underwriting** experience (**23 years**)
- History of representing both **Plaintiff & Defense equally** in expert testimony consulting
- Provided testimony in **all 11 federal districts / Federal Rule 26 Report** specialization
- 700+ Expert retentions / 100+ depositions / 25 trial testimonies / 50+ arbitration retentions
- **Reinsurance company Founder / Owner / President (1992-2019)**
- Non-attorney, credentialed mediator from **DePaul Law School**, Chicago, Illinois

**Website:   www.Leatzow.com**                    **Education:**  B.A., Ripon College – 1969

**Professional Memberships & Experience:**

- Independent Insurance Agents & Brokers of America (IIAA)
- Former ARIAS Certified insurance & reinsurance Arbitrator (19 years)
- Private pilot of 58 years experience with Commercial, Multi-Engine, Instrument & Seaplane ratings
- Former Corps of Engineers Officer & Combat Engineer Company Commander (1970-1974)



**7594 Highway X, Three Lakes, WI 54562**
**Office: 715-546-3300 / Jim@Leatzow.com**
**www.LEATZOW.com**

(4/23)

# EXHIBIT B

Page 58

1    document itself really throughout the exclusions and

2    this was their basis when they had a clear obligation

3    to delineate how those things applied.

4          And finding coverage means that you are

5    equally searching for the benefit of your client,

6    which is in this case Wildwood, to see if anything

7    might have applied to provide coverage to them.  And

8    that's a basic part of good faith handling and one

9    that I'm critical of because they didn't do that.

10        Q   Is your opinion that AmFam failed to attempt

11   to find coverage based solely on the statements made

12   in AmFam's denial letter?

13        A   No.  It's based upon custom and practice

14   within the industry.  That's the basis of it.  And so

15   there are -- we can look at -- finding coverage is

16   wrapped into a number of things, including the lack of

17   explanation which was just phenomenal and that's a

18   requirement absolutely.

19         The wind-driven rain was never adequately

20   described as would be critical of this.  The lack of

21   response is part of the issue and as well as the

22   attempt to identify and show that AmFam made an

23   attempt to look for coverage for their client.  And if

24   they did look for it and said but we couldn't -- we

25   couldn't find it, then I would have been satisfied.

d383aea6-aab4-4389-a3b4-044605ab7037

# EXHIBIT C

Page 57

1    A    That, as I recall, was dealing with the issue

2    of wind-driven rain.  AmFam never provided an

3    explanation of their position regarding wind-driven

4    rain, as was their duty to do so, and that had been

5    included in correspondence from the association as

6    well.

7    Q    Your second opinion noted on page 6 of your

8    report is that AmFam failed to attempt to, quote, find

9    coverage, closed quote, for their insured, Wildwood,

10   as was their obligation and duty to do so.

11        My question for you is where this opinion is

12   discussed in your report?

13   A    Where does -- say that again.  I couldn't hear

14   you.

15   Q    My question is:  Opinion number 2, I'd like to

16   know where that is discussed within your report.

17   A    Finding coverage is one of the basic tenets of

18   good faith handling, and to the extent that if an

19   insurer is acting in bad faith, then it is not acting

20   in good faith.  And good faith includes finding

21   coverage, and there was an absolute lack of that in

22   here.

23        When AmFam issued their denial letter, they

24   put forth a bunch of exclusions but failed to provide

25   and tie back any of the information to their policy

d383aea6-aab4-4389-a3b4-044605ab7037

Page 58

1  document itself really throughout the exclusions and

2  this was their basis when they had a clear obligation

3  to delineate how those things applied.

4       And finding coverage means that you are

5  equally searching for the benefit of your client,

6  which is in this case Wildwood, to see if anything

7  might have applied to provide coverage to them.  And

8  that's a basic part of good faith handling and one

9  that I'm critical of because they didn't do that.

10     Q   Is your opinion that AmFam failed to attempt

11  to find coverage based solely on the statements made

12  in AmFam's denial letter?

13     A   No.  It's based upon custom and practice

14  within the industry.  That's the basis of it.  And so

15  there are -- we can look at -- finding coverage is

16  wrapped into a number of things, including the lack of

17  explanation which was just phenomenal and that's a

18  requirement absolutely.

19       The wind-driven rain was never adequately

20  described as would be critical of this.  The lack of

21  response is part of the issue and as well as the

22  attempt to identify and show that AmFam made an

23  attempt to look for coverage for their client.  And if

24  they did look for it and said but we couldn't -- we

25  couldn't find it, then I would have been satisfied.

d383aea6-aab4-4389-a3b4-044605ab7037

Page 59

1  But there was no nod whatsoever and no explanation of

2  their methodology trying to find coverage for that

3  client.  And so that's what this is referring to.

4      Q   Do you know for a fact that AmFam did not

5  attempt to find coverage, or is it your statement that

6  AmFam did not communicate its attempt to find

7  coverage?

8              MS. FENIELLO:  Object to form.

9      A   Go ahead.  I'm sorry.

10             MS. FENIELLO:  Sorry.  Object to the

11  form.

12         But you can answer if you can.

13     A   They have a duty and obligation to explain

14  their claim process to their client, and they failed

15  to do so at every turn.  Not only did they fail to tie

16  back the exclusions they were claiming, that has to be

17  explained individually.  But they also did not offer

18  any explanation as to what they had attempted to do to

19  find coverage.

20         If they did so, then they should have put it

21  forth.  They did not.  And so it was woefully lacking

22  and, oh, by the way, untimely.  That's the essence of

23  this case.

24     Q   And I'll move to strike the answer as

25  nonresponsive in part.

Page 60

1          Sir, my question was whether or not you know

2    for a fact that AmFam did not attempt to find

3    coverage?

4              MS. FENIELLO:  Objection, asked and

5    answered.

6      A    They did not explain any of their actions, so

7    I necessarily reasonably made an assumption they had

8    not done so.  They had a duty to explain it and failed

9    to.

10     Q    Mr. Leatzow, your third opinion on page 6 of

11   your report is that AmFam failed to act in good faith

12   throughout their adjusting of the Wildwood claim and

13   placed their financial benefit ahead of their

14   policyholder, Wildwood.  Such unreasonable handling of

15   the Wildwood claim can only be characterized as having

16   acted in bad faith.

17            Do you see that?

18     A    I do.

19     Q    My first question is where in your report do

20   you discuss AmFam placing their financial benefit

21   ahead of Wildwood's?

22     A    They were doing so by denying a claim without

23   adequate explanation.  And so if they were -- if their

24   denial was woefully lacking, which it was, with no

25   explanations and they were denying coverage to a

d383aea6-aab4-4389-a3b4-044605ab7037

# EXHIBIT D

Page 60

1          Sir, my question was whether or not you know

2     for a fact that AmFam did not attempt to find

3     coverage?

4               MS. FENIELLO:  Objection, asked and

5     answered.

6          A    They did not explain any of their actions, so

7     I necessarily reasonably made an assumption they had

8     not done so.  They had a duty to explain it and failed

9     to.

10         Q    Mr. Leatzow, your third opinion on page 6 of

11    your report is that AmFam failed to act in good faith

12    throughout their adjusting of the Wildwood claim and

13    placed their financial benefit ahead of their

14    policyholder, Wildwood.  Such unreasonable handling of

15    the Wildwood claim can only be characterized as having

16    acted in bad faith.

17              Do you see that?

18         A    I do.

19         Q    My first question is where in your report do

20    you discuss AmFam placing their financial benefit

21    ahead of Wildwood's?

22         A    They were doing so by denying a claim without

23    adequate explanation.  And so if they were -- if their

24    denial was woefully lacking, which it was, with no

25    explanations and they were denying coverage to a

Page 61

1    policyholder lacking that explanation, they are

2    putting themselves in a position by their actions to

3    not have to pay money out and not explain it.  And

4    that would be classic bad faith.

5          And that is ultimately putting one's self

6    ahead of the policyholder.  I saw no nod whatsoever

7    throughout the claim handling on the part of AmFam in

8    this claim where they attempted to act appropriately

9    and find coverage for their customer.  And so if

10   they're not finding coverage -- if they failed to find

11   it but tried, one would expect to see that.  I didn't

12   see any instance of that, so that is the basis on

13   which they're putting themselves financially ahead of

14   their policyholder.

15   Q    Is it correct that the extent of your

16   examination of AmFam's actions consisted of examining

17   the claim file?

18              MS. FENIELLO:  Object to the form.

19   A    And the correspondence that I reviewed.

20   Q    Other than the opinions set forth on page 6 of

21   your report, have you formed any other opinions in

22   relation to this lawsuit?

23   A    No, not as of this time.

24   Q    Okay.  And do you expect to form any more

25   opinions in this lawsuit prior to trial?

d383aea6-aab4-4389-a3b4-044605ab7037

# EXHIBIT E

Page 31

1   can speak a little bit slower, that would be helpful

2   to me.

3        Q   Of course.  Referring, again, to page 4 of

4   your report and the code provision that's cited

5   therein, the provision requires, quote, reasonable

6   assistance to the insurer in order to facilitate

7   compliance with this provision, closed quote, doesn't

8   it?

9        A   Yes.

10       Q   In the course of preparing your opinion, did

11  you conduct any analysis of whether Wildwood complied

12  with this requirement of the code?

13                 MS. FENIELLO:  Object to form.

14         You can answer.

15       A   That would be -- I view that as a coverage

16  issue as opposed to it was not Wildwood that was

17  providing any form of delay, and so I did note that

18  because I did note -- my job is to search for the

19  truth.  And in this instance, I didn't see where

20  Wildwood had withheld anything from AmFam.

21         And to the contrary, AmFam was the one that

22  had basically, or so it appeared, dragged their feet

23  for a profound amount of time ultimately only to come

24  up with their finding 14 months later.

25       Q   And I'll move to strike that response as

d383aea6-aab4-4389-a3b4-044605ab7037

Page 32

1    nonresponsive.  I'm going to ask you again,

2    Mr. Leatzow.

3         In the course of preparing your opinion, did

4    you conduct any analysis of whether Wildwood complied

5    with this requirement of the code?

6              MS. FENIELLO:  Objection, asked and

7    answered.

8      A   I viewed the parties equally, and to the

9    extent that that is viewed as an analysis, I made a

10   determination that Wildwood had not -- had not

11   breached anything that I reviewed.  But to the extent

12   that's part of the procedure, then so be it.  But I

13   did offer my opinion, as I stated, regarding AmFam's

14   delay as being part of the findings.

15        And so I did not find -- and so, therefore, I

16   guess I did my analysis on whether Wildwood had

17   complied, and I found no breach of anything concerning

18   the information they were being put forth.

19     Q   In the course of your investigation, do you

20   recall seeing any letters from AmFam to Wildwood

21   asking for information to be provided?

22     A   Not that I recall that was denied or not

23   provided.

24     Q   Would requests such as that, if, in fact,

25   Wildwood had -- I'm sorry.  Let me rephrase that

Page 39

1     A   I don't recall.

2     Q   Do you have any idea of the volume or content

3  of the records that AmFam may have requested from

4  Wildwood in this case?

5     A   No, I don't recall that either.

6     Q   That's not something you analyzed as part of

7  your work in this case?

8     A   It was my understanding from what I reviewed

9  that it was an open book, so all of the records that

10  were available -- and, again, I took from what I

11  reviewed that nothing was being withheld in terms of

12  going all the way back to construction and some of the

13  earlier -- earlier events that occurred at Wildwood.

14     Q   Now, referring again to page 5 of your

15  report -- and I think you mention this in one of your

16  prior answers -- you refer to an additional important

17  gesture.  What was that gesture?

18     A   Where are you reading from?

19     Q   The second paragraph of page 5 of your report.

20     A   Yes.  I'm referring to the two -- I call them

21  gestures on the part of Wildwood making records

22  available both in person and then ultimately with a

23  digital electronic link.

24     Q   And you also note that Wildwood offered to

25  make the complex available for visual inspection;

d383aea6-aab4-4389-a3b4-044605ab7037

Page 40

1    right?

2        A    That's my understanding, correct.

3        Q    Wasn't that a requirement of the policy?

4               MS. FENIELLO:  Object to the form,

5    beyond the scope.

6               But you can answer if you can.

7        A    Yeah.  I don't -- I don't have any answer for

8    that one.

9        Q    That wasn't something that you analyzed as

10   part of your work?

11              MS. FENIELLO:  Objection, asked and

12   answered.

13       A    No.  My -- my marching orders in this case was

14   to only offer my opinions concerning the process and

15   procedure and the manner in which the claim was

16   adjusted.

17       Q    Okay.  Referring to the same paragraph, I

18   think it's one sentence when it possibly should be

19   two.  So I'd like for you to read it to yourself, and

20   then I'll ask you a couple questions.  Okay?

21       A    Which ones are you referring to?

22       Q    Just the second paragraph on page 5 of your

23   report starting with "An additional important

24   gesture."

25       A    All right.

d383aea6-aab4-4389-a3b4-044605ab7037

Page 51

1    policyholder of that magnitude.

2        Q    Now, you've testified today that Wildwood was

3    reasonable in that it provided, in your words, a

4    cascade of information or a timely flow of

5    communication to AmFam; correct?

6        A    Yes, generally so.

7        Q    But you also did not attempt to investigate

8    what AmFam was doing to reach a coverage

9    determination; correct?

10       A    I was interested in their outcome, and I was

11   interested as well in the flow of information that was

12   coming, basically, between the two.  And -- but I saw

13   nothing that would have underscored or justified the

14   delays.

15       Q    But you didn't look for one; correct?

16            MS. FENIELLO:  Object to form.

17       A    I didn't -- I don't go digging through that

18   kind of file.  I didn't see anything in the claim file

19   that indicated the justification for it.

20       Q    Wouldn't a reasonableness determination

21   require you to examine the actions of both parties,

22   not just one?

23            MS. FENIELLO:  Object to form.

24       A    I would agree, and I believe I did that.

25       Q    And how did you do that with respect to AmFam?

Page 52

1        A     In terms of my review of the claim file, I
2   didn't see anything that would have justified the
3   protracted amount of time.  And, once again, two
4   months after the letter went out in I believe it was
5   September of 2020 asking for will you give us the
6   coverage determination, that's never been justified in
7   anything that I've reviewed in this file, none.
8        Q    Now, AmFam ultimately denied Wildwood's claim;
9   correct?
10       A    Yes.
11       Q    Okay.  And you refer to the November 16, 2020,
12  denial letter on page 5 of your report.  And you state
13  in quotes and italics:  We regret that we could not be
14  of assistance to you, closed quote.
15            Do you see that?
16       A    Where are you reading from?
17       Q    The fourth paragraph on page 5, beginning with
18  "AmFam finally responded."
19       A    What is the first part of the paragraph you're
20  referring to so I can get there?
21       Q    "AmFam finally responded on November 16,
22  2020."
23       A    On page 5?
24       Q    Yes, sir.
25       A    Pull it up on the screen.  This is kind of

d383aea6-aab4-4389-a3b4-044605ab7037

# EXHIBIT F

Page 16

1    major insurers in the United States in my caseload.

2        Q   Do you recall the specifics of any case where

3    AmFam was a party?

4        A   I really don't.

5        Q   Can you estimate for me when the last time you

6    were involved in a case involving AmFam was?

7        A   Probably five or six years.

8        Q   Turning back to this matter, in broad terms,

9    general terms, after you were retained, what were you

10   asked to do?

11       A   I was asked to offer my opinions, do the

12   requisite review and analysis, and evaluate the

13   process undertaken by AmFam in their adjusting of this

14   claim.  And so it really is procedure oriented as

15   opposed to coverage and so forth.  I wasn't asked to

16   and did not and do not offer any opinions as to the

17   coverages and so forth.  It's more about how did AmFam

18   comport themselves in handling the claim ultimately.

19       Q   And did you complete that assignment?

20       A   Yes, I did.

21       Q   And is your work reflected in the expert

22   report you prepared in connection with this case?

23       A   I believe it is.

24       Q   And as you sit here today, Mr. Leatzow, do you

25   currently anticipate performing any more work prior to

d383aea6-aab4-4389-a3b4-044605ab7037

Page 40

1    right?

2         A    That's my understanding, correct.

3         Q    Wasn't that a requirement of the policy?

4              MS. FENIELLO:  Object to the form,

5    beyond the scope.

6         But you can answer if you can.

7         A    Yeah.  I don't -- I don't have any answer for

8    that one.

9         Q    That wasn't something that you analyzed as

10   part of your work?

11             MS. FENIELLO:  Objection, asked and

12   answered.

13        A    No.  My -- my marching orders in this case was

14   to only offer my opinions concerning the process and

15   procedure and the manner in which the claim was

16   adjusted.

17        Q    Okay.  Referring to the same paragraph, I

18   think it's one sentence when it possibly should be

19   two.  So I'd like for you to read it to yourself, and

20   then I'll ask you a couple questions.  Okay?

21        A    Which ones are you referring to?

22        Q    Just the second paragraph on page 5 of your

23   report starting with "An additional important

24   gesture."

25        A    All right.

d383aea6-aab4-4389-a3b4-044605ab7037